UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDY S.,[1] | ) |
|              Plaintiff, | ) No. 23 CV 2882 ) ) |
| v. | ) Magistrate Judge Young B. Kim ) |
| FRANK BISIGNANO, Commissioner of Social Security, | ) ) ) February 24, 2026 |
|              Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Sandy S. seeks disability insurance benefits asserting that she is disabled by mental health conditions. She brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for benefits. For the following reasons, Sandy's remand request is granted:

**Procedural History**

Sandy filed her benefit application in July 2020 claiming disability as of October 4, 2018. (Administrative Record ("A.R.") 21.) After her application was denied initially and upon reconsideration at the administrative level, she sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 21, 171-183.) Sandy appeared with her attorney at a June 2022 video hearing at which she and a vocational expert ("VE") testified. (Id. at 43-66.) In August 2022 the ALJ found

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Sandy's first name and last initial in this opinion to protect her privacy to the extent possible.

that Sandy suffered from severe mental health impairments but was not disabled. (Id. at 24-28.) The Appeals Council denied Sandy's request for review, (id. at 7-12), making the ALJ's denial the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Sandy then filed this action seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Sandy argues that the ALJ failed to: (1) properly consider her treating psychiatrist Dr. Joseph Beck's opinions; (2) properly account for her social interaction and concentration, persistence, and pace ("CPP") limitations; and (3) fully consider her subjective symptoms. (See generally R. 14, Pl.'s Mem.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). But the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021), and "provide an explanation . . . 'sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review,'"

*Warnell v. O'Malley,* 97 F.4th 1050, 1054 (7th Cir. 2024) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). Having considered the record under this standard, remand is warranted here.

**A.    Subjective Symptom Assessment**

The court first addresses Sandy's argument that the ALJ erred when assessing her subjective symptoms because errors here will require reconsideration of her residual functional capacity ("RFC"). (R. 14, Pl.'s Mem. at 12-14.) An RFC measures the tasks a person can perform given her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). The ALJ must incorporate a claimant's limitations, including any that are not severe, when developing the RFC and may not dismiss a line of evidence that is contrary to the ruling. *See Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020). In so doing, the ALJ must "say enough to enable review of whether [he] considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), providing a "logical bridge" between the evidence and his conclusions, *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). Accordingly, where an ALJ improperly discounts a claimant's symptoms and the resulting functional limitations, remand is required for further evaluation.

An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). But the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691

3

(7th Cir. 2015), and must consider factors such as medication efficacy and side effects, daily activities, treatment received, and precipitating pain factors, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). That said, the court will not disturb a symptom evaluation that is logically based on specific findings and evidence. *See Murphy*, 759 F.3d at 815. The ALJ's assessment meets this low bar.

Sandy's core complaint is that the ALJ unduly focused on "routine, mundane activities of daily living"—namely Sandy's crocheting—"to discredit her subjective symptoms and testimonial evidence." (R. 19, Pl.'s Reply at 12-13.) Meanwhile, she says the ALJ ignored references to her other daily activities that are consistent with her subjective symptom statements, including her constant struggles with chores like sweeping or mopping because of pain, limiting them for only five minutes before needing a break, carrying heavy bags, and being able to perform basic tasks like dressing without her husband's help. (A.R. 52, 269-70, 293.) She also accuses the ALJ of ignoring the fact that she received chiropractor treatments and massage therapy, needs to have her emotional support dog to help resolve panic attacks, and wears a back brace for pain management. (R. 14, Pl.'s Mem. at 4, 12-14.) And lastly, she says the ALJ relied too heavily on "improvement" of her symptoms that was "only transient in nature." (Id. at 13 (citing A.R. 34).)

Daily activities generally must be considered "with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). And before an ALJ can hold such activities against a claimant, she must "explain the 'inconsistencies' between [the] activities . . . complaints of pain, and the medical evidence," *Zurawski v. Halter*, 245 F.3d 881, 887

4

(7th Cir. 2001), and consider limitations in the claimant's performance of those activities, *see, e.g.*, *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding where ALJ ignored claimant's qualifications as to how he carried out activities). While the ALJ flagged Sandy's crocheting activity several times in her decision, she did so in the context of describing how this activity demonstrates Sandy's ability to concentrate and focus on a detail-oriented process, (A.R. 26, 27, 33), use both hands, (id. at 26), and help with her OCD, Tourette's, and nervous energy, (id.). The ALJ also considered her other abilities and activities when assessing her subjective symptoms. For example, the ALJ noted that Sandy could perform basic household chores and complete simple tasks, albeit with limitations, walk regularly as a form of exercise, and shop for groceries frequently. (Id. at 26-27, 30, 33.)

The ALJ also considered Sandy's treatment and medication for both her physical and mental symptoms, including treatment that Sandy says the ALJ ignored. For instance, the ALJ noted Sandy's back brace, massage therapy, chiropractor care, and injection treatments for her back pain, along with prescription medications for OCD, anxiety, depression, pain, spasms, and other underlying conditions like obesity. (Id. at 24, 29-32, 34.) While some of Sandy's treatment may have provided only temporary relief, the ALJ was permitted to consider how her physical symptoms improved with medication. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (requiring ALJ to consider medication efficacy and treatment received).

In the end, the ALJ adequately accounted for Sandy's symptoms and offered substantial evidence when she discounted the severity of these symptoms. As such,

5

this court declines to nit-pick the ALJ's credibility assessment, given the maxim that it "need not be perfect; it just cannot be patently wrong." *Dawson v. Colvin*, No. 11 CV 6671, 2014 WL 1392974, at *10 (N.D. Ill. April 14, 2014) (citing *Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013)). Having relied on more than just Sandy's crocheting to assess and discount her symptom allegations, the ALJ cleared that low bar here. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (affirming symptom assessment despite flawed activities analysis since "[n]ot all of the ALJ's reasons [for disbelieving a claimant] must be valid as long as *enough* of them are") (emphasis in original).

**B.    Opinion Evidence**

Sandy also complains that the ALJ erred by: (1) failing to accommodate the limitations Dr. Beck cited in his August 2021 opinions, despite finding this opinion "somewhat persuasive"; and (2) rejecting without explanation Dr. Beck's opinion that Sandy would miss work more than three days per month. (R. 14, Pl.'s Mem. at 6-10.) An ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must assess the persuasiveness of all medical opinions by considering and explaining the most important factors—supportability and consistency. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires consideration of the objective medical evidence and explanations the medical source presented and used, 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), while the consistency factor directs the ALJ to consider and explain

6

how the opinion is consistent with all other medical and nonmedical sources, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ also may, but is not required to, explain how she considered the medical source's specializations and relationship with the claimant and any other factors that tend to support or contradict the source's opinion. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2).

After treating Sandy for more than two years, Dr. Beck completed a mental impairment questionnaire in August 2021 noting an OCD diagnosis and endorsing mild to moderate limitations in 17 mental functioning areas. (A.R. 514-16.) Dr. Beck opined that Sandy's symptoms would interfere with concentration needed to perform even simple tasks during 16% to 20% of a typical workday and cause her to miss work more than three times per month. (Id. at 515-16.) The ALJ deemed Dr. Beck's opinion "only somewhat persuasive." (Id. at 34.) On the one hand, she found persuasive Dr. Beck's opinion that Sandy suffers from mild to moderate limitations in mental functioning and moderate limitations in all paragraph B domains except understanding, remembering, and applying information. (Id.) On the other, she found unpersuasive Dr. Beck's opinion that Sandy would miss work "more than three times per month." (Id.)

Sandy argues that the ALJ did not discuss—and her RFC assessment fails to reflect—other moderate limitations Dr. Beck identified, including her inability to complete a workday or workweek without interruption, perform activities within a schedule, set realistic goals, or be punctual. (R. 14, Pl.'s Mem. at 7-8.) In her reply, Sandy asserts that the ALJ must "provide some supported reason for only adopting

7

portions" of a medical opinion and explain why she rejected certain limitations "while crediting other parts of the opinion" but that she failed to do so. (See R. 19, Pl.'s Reply at 1-2.)

Sandy assumes that if the ALJ did not explicitly discuss, discount, or include in the RFC every specific limitation noted in a medical opinion, then she necessarily ignored a line of evidence. It is true that an ALJ "must incorporate a claimant's limitations," including those that are not severe, into the RFC, *see Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020), but she need not "discuss every piece of evidence in the record" so long as she does not "ignore a line of evidence supporting a finding of disability," *Thorlton v. King*, 127 F.4th 1078, 1082 (7th Cir. 2025) (quoting *Deborah M.*, 994 F.3d at 788). But the cases Sandy relies on do not support her argument that the ALJ impermissibly "cherry-picked" the record and ignored evidence by failing to discuss certain limitations Dr. Beck endorses. To be sure, Sandy cites *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), in support of her argument. However, in that case the ALJ relied on an outlier when fashioning the mental RFC— that is, the ALJ pointed to the single highest mental functioning score the claimant had ever received, despite that this score was assessed two weeks before the claimant suffered a psychotic episode. *Yurt*, 758 F.3d at 859. The other cases Sandy relies on are similar to *Yurt*. (See R. 19, Pl.'s Reply at 2 (citing *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001) (finding RFC insufficient where ALJ never discussed important medical records); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (finding RFC insufficient where ALJ ignored all evidence regarding several

8

limitations); *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (finding RFC insufficient where ALJ misconstrued and cherry-picked medical opinion)).)

In contrast, the ALJ here did not disregard Dr. Beck's opinions or ignore an entire line of evidence. Rather, she incorporated Dr. Beck's specific opinions in the RFC, albeit in a way that Sandy finds inadequate. The ALJ agreed with Dr. Beck's underlying opinions that Sandy is moderately limited in several of the broader paragraph B criteria, (A.R. 34), and her decision matched Dr. Beck's opinion in that respect, (id. at 26-27). The ALJ also acknowledged that Sandy "has trouble paying attention if her tics act up. However . . . in solo settings, she does not experience these tics." (Id. at 27 (citing id. at 496).) To support her finding, the ALJ referenced that Sandy often crochets, noting that crocheting is a "solitary task with no specific timeframe for finishing" and upon which Sandy can concentrate "for hours at a time." (Id. at 33-34.) The ALJ then fashioned an RFC that accommodates Sandy's CPP limitation by minimizing her exposure to others, thereby reducing her anxiety, OCD, and tics and allowing her to concentrate. (See, e.g., id. at 31 (explaining that "the claimant has endorsed that her symptoms worsen significantly in situations where she is surrounded by more people. For that reason, she can interact with coworkers and supervisors on a superficial basis [and] no group or team-based activities. She cannot work with the public.").) This RFC limitation also directly bears on Sandy's limited ability to "complet[e] a workday/workweek without interruption," which Sandy says the ALJ ignored. (R. 14, Pl.'s Mem. at 8.)

9

By minimizing Sandy's exposure to others, the ALJ also addressed Dr. Beck's opinions that her symptoms would limit and "interfere with [her] attention and concentration needed to perform even simple tasks" 16% to 20% of the time Sandy and that she has limited ability to "perform[] activities within a schedule" and "set[] realistic goals." (Id. (citing A.R. 515).) The ALJ explained that when Sandy crochets alone and her concentration limitation is mitigated, she can follow patterns/instructions without difficulty and focus for hours at a time. (A.R. 33.) Because the RFC mitigates her concentration limitations, it enhances Sandy's ability to follow instructions and focus for hours at a time. Sandy's ability to follow instructions and focus in turn mitigates any limitations in performing activities within a regular schedule and setting realistic goals regarding those activities—the limitations Sandy says were ignored. (R. 14, Pl.'s Mem. at 8.) The ALJ also concluded that when Sandy's concentration limitations are mitigated, she "would be able to respond appropriately to occasional, gradually introduced changes in a work setting." (A.R. 34.) In short, the ALJ supplied substantial evidence to support her analysis of this part of Dr. Beck's opinion, and the RFC accounts for the handful of specific limitations Dr. Beck cited. While the ALJ's analysis could have been more precise, this "shortcoming" in confronting opinion evidence does not require reversal. *See Thorlton*, 127 F.4th at 1082 (noting that while an ALJ "[c]ould have done better to directly confront" evidence contrary to their finding, "that shortcoming" did not require reversal where "viewing the decision in its entirety," the court was "confident the ALJ considered" the evidence).

10

That said, the ALJ's decision to reject Dr. Beck's opinion that Sandy would miss work more than three times per month, (A.R. 34), does warrant remand. The ALJ explains she found this opinion unpersuasive because Sandy was last hospitalized in 2018 and was never referred for additional treatment thereafter. The government responds that the ALJ's analysis is correct because reports like the one Dr. Beck completed—where symptoms, limitations, and medical history are just checkboxes—are "less persuasive" than a narrative summary, and because other parts of Dr. Beck's statement support finding that Sandy could perform a reduced level of unskilled light work. (R. 18, Def.'s Opp. at 2-3.)

The government may be correct on the law, but it fails to clarify how Sandy's lack of hospitalizations undermines Dr. Beck's opinion that she would miss work three or more days per month. As Sandy points out, the "lack of inpatient psychiatric hospitalization[]" does not automatically mean that Sandy was in good enough shape to work on a particular day—only that she was not in bad enough shape to be hospitalized. (See R. 14, Pl.'s Mem. at 6.) Claimants suffering from mental impairments have difficulty maintaining treatment and their symptoms can ebb and flow, which may have prevented Sandy from hospitalization. *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (noting that "mental illness in general . . . may prevent the sufferer from . . . submitting to treatment"). And as Sandy points out, courts have "questioned the premise" whether "a person experiencing severe panic attacks necessarily would go to the emergency room or would be hospitalized as part of a treatment plan." *See Thompson v. Berryhill*, No. 16 CV 50358, 2018 WL 6018608,

11

at *3 (N.D. Ill. Nov. 16, 2018); *see also, e.g.*, *Mattson v. Berryhill*, No. 16 CV 10533, 2017 WL 5011890, *5 (N.D. Ill. Nov. 2, 2017) ("It is plausible that one may be unable to work but not need psychiatric hospitalization . . .").

The ALJ also dismissed Dr. Beck's opinion based on evidence that while Sandy reported isolating herself from others because of OCD and anxiety, she also spent time with her crocheting friends and attended church. (A.R. 34.) But the ALJ fails to explain how occasional social and religious gatherings bear on the supportability or consistency of Dr. Beck's opinion that Sandy is likely to miss work three or more days per month. Nor can the court independently discern a connection. In sum, this court is unable to follow the path of logic between the evidence and conclusion that Sandy would not miss work three or more days per month. And given the VE's testimony that "one and a half days of work per month" is the tolerance for absenteeism in the hypothetical that mirrored the RFC, (id. at 61-62), nor can this court say that these errors are harmless. As Sandy correctly points out, "the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." (R. 19, Reply at 1 (quoting *Yurt*, 758 F.3d at 857).). Because substantial evidence is lacking on this point, remand is required.

**C. Mental RFC Assessment**

Lastly, Sandy argues that the ALJ failed to explain how the RFC accommodates her moderate CPP limitation. (R. 14, Pl.'s Mem. at 9-10.) Sandy argues that the ALJ's assessed limitations—including finding that she "cannot

12

perform production-rate work such as assembly line work" and limiting her "to superficial interaction with supervisors and coworkers, no team-based activities, no interaction with the public adequately captured moderate limitations in concentration, persistence and pace"—fail to accommodate her moderate CPP limitation. (R. 14, Pl.'s Mem. at 9-10; R. 19, Pl.'s Reply at 5.) She also says the ALJ "provided no explanation" for how this restriction accommodates a moderate CPP limitation and "[s]uch omissions have been found to be reversible error." (R. 14, Pl.'s Mem. at 10 (citing *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021)).

But *Lothridge* involved a claimant for whom there was "considerable evidence [of] problems with concentration and memory and poor coping skills," requiring "frequent breaks," along with "depress[ion] and fatigue[]," and "struggles to care for herself." *Lothridge*, 984 F.3d 1227 at 1232. Despite noting the claimant only "'sometimes finished what she started,' 'got frustrated easily,' 'did not handle stress well,' and had 'some challenges with concentration,'" the ALJ in *Lothridge* failed to include "corresponding restrictions" or address her ability to stay on task or perform at a required speed. *Id.* at 1233. This is not the case here because the ALJ restricts Sandy's exposure to others, which she testified causes anxiety, OCD, and tics, which in turn impact her concentration level. (See, e.g., A.R. 27, 31, 33-34.)

The only additional "evidentiary gap" Sandy points to is where the ALJ did not address a note in a state agency reviewer's opinion that Sandy could be "distractible at times." (R. 14, Pl.'s Mem. at 10-11 (quoting A.R. 108).) This reviewer's one-off comment is not at odds with the ALJ's analysis and conclusion, and in any event, that

13

same reviewer also opined that Sandy was "[n]ot significantly limited" in her "ability to maintain attention and concentration for extended periods." (A.R. 107-08).

Sandy also complains that the RFC limiting her to no contact with the general public and only superficial contact with supervisors and coworkers does not address her moderate social interaction limitation because her issue "was not the [level of contact] but the number of individuals in her proximity." (R. 14, Pl.'s Mem. at 11-12.) She says she had to work around 35 to 40 people in her previous employment from which she was terminated. (Id. at 13.) Sandy is right that limiting her contact with the public and coworkers does not necessarily limit the number of coworkers near her. But she fails to develop her argument within the context of the jobs the VE identified. That said, because the matter is being remanded, the ALJ must ensure that the available jobs the VE identified will not place Sandy in an environment that negates the prescribed CPP accommodation.

## Conclusion

For the foregoing reasons, Sandy's remand request is granted, and this matter is remanded for further proceedings consistent with this opinion.

                        **ENTER:**

                        _____
                        **Young B. Kim**
                        **United States Magistrate**